## IN THE COURT OF APPEALS OF IOWA

No. 16-1774
Filed January 11, 2017

**IN THE INTEREST OF W.A., C.A., B.A., and H.A.,**
**Minor children,**

**A.A., Mother,**
        Appellant,

**N.A., Father,**
        Appellant.

_____

Appeal from the Iowa District Court for Warren County, Mark F. Schlenker, District Associate Judge.

The mother and father appeal separately the termination of their parental rights. **AFFIRMED ON BOTH APPEALS.**

Amanda M. Bartusek of Stoltze & Stoltze, P.L.C., Des Moines, for appellant mother.

Bryan P. Webber of Carr & Wright, P.L.C., Des Moines, for appellant father.

Thomas J. Miller, Attorney General, and Kathryn K. Lang, Assistant Attorney General, for appellee State.

Nancy L. Pietz of Pietz Law Office, Des Moines, attorney and guardian ad litem for minor child, W.A.

Mary Kathryn Miller of Juvenile Public Defender, Des Moines, attorney and guardian ad litem for minor children, C.A., B.A., and H.A.

Considered by Vaitheswaran, P.J., and Potterfield and Bower, JJ.

**POTTERFIELD, Judge.**

The mother and father appeal separately from the order terminating their parental rights to their four children, who at the time of the termination hearing ranged in ages from thirteen to three years old. Each parent claims the following: the statutory grounds for termination have not been met, a six-month extension to continue working toward reunification is warranted, termination is not in the best interests of the children, and the court should have placed the children in a guardianship with the paternal grandmother.

**I. Background Facts and Proceedings.**

This family has been previously involved with the Iowa Department of Human Services (DHS) and the juvenile court due to both parents' abuse of methamphetamine. In April 2012, when DHS was attempting to assess the safety of the family home, the father fired a gun at the car of a DHS worker as she was leaving the family property. The children were then removed from the parents' home. The father was charged with several crimes and ultimately pled guilty to intimidation with a dangerous weapon. He was sentenced to a term of imprisonment, which began in late September 2014. The mother participated in drug-rehabilitation treatment and other services, and the children were able to return to the family home. The case was successfully closed in early 2014.

DHS became involved with the family again in April 2015, after local law enforcement alerted DHS to their belief the mother was using methamphetamine. The father was incarcerated at this time and remained incarcerated throughout the case. DHS attempted to implement a safety plan that would allow the children to remain in the family home, but the mother refused to provide a sample

for urinalysis (UA). All four children were removed on April 24, 2015. The youngest child's hair was tested and was positive for methamphetamine and amphetamine.

The termination hearing took place over four dates: June 2, 3, and 23, and July 1, 2016. At the hearing, the mother admitted that although she had denied using methamphetamine from the time the children were removed until April 2016—when she began outpatient drug-rehabilitation treatment—she had used the drug "the majority of the month" in April 2015, "the majority of the month" in February 2016, and once in April 2016. The mother's most recent positive drug test occurred on April 29, 2016. The mother was arrested on two separate occasions in 2016, and the criminal charges were still pending at the time of the hearing. The mother was without employment. The electricity to the family home had only recently been turned back on at the time of the first couple days of the termination hearing, and it was off again by the final day; the water to the home had also been turned off. The mother missed four visits with the children in the month of June, and she started seeing a new therapist between the hearing dates.

The mother testified that she would like to have the children returned to her, but she admitted she was not in a position for that to occur at the time of the hearing. She asked the court for a six-month extension.

The father testified telephonically from prison during one day of the hearings. He testified that he was able to call the children and often did so. He had also had a number of visits with the children at the prison. He asked the

court for a six-month extension, noting that he would be discharged on November 26, 2016.

Both parents testified they would prefer the children be placed in a guardianship with the paternal grandmother over other alternatives before the court.

The court terminated both parents' rights to each of the four children. The court terminated both the mother's and the father's rights to W.A., C.A., and B.A. pursuant to Iowa Code section 232.116(1)(f) (2015) and to H.A. pursuant to section 232.116(1)(h). The court also terminated the father's parental rights to all four children under section 232.116(1)(b); the mother's rights were terminated to each of the four children under section 232.116(1)(*l*).

The mother and father both appeal.

## II. Standard of Review.

We review the juvenile court's decision to terminate de novo. *See In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016).

## III. Mother's Appeal.

The mother challenges the statutory grounds for termination. When a parent's rights have been terminated, we affirm if we find any one of the grounds supported by clear and convincing evidence in the record. *See In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010).

The court terminated the mother's rights to W.A., C.A., and B.A. pursuant to section 232.116(1)(f) and to H.A. pursuant to subsection (h). For the court to terminate under these grounds, the child must be of a specific age, have been adjudicated CINA, and have been out of the home for a specific period of time.

The mother does not dispute that each of the three elements were met for each child. Rather, she challenges the court determination under the final element—that the children could not be returned to her care at the time of the termination hearing. *See* Iowa Code § 232.116(1)(f)(4), (h)(4). In the alternative, the mother maintains that if the children could not be returned to her care at the time of the hearing, they could have been returned after an additional six months. *See id.* § 232.104(2)(b).

In the mother's own estimation, she was not in a position to have the children returned to her at the time of the termination hearing. The family home did not have working electricity or water. The mother had, at best, relapsed on methamphetamine approximately one month before the termination hearings began and was still weeks from finishing her outpatient treatment when they concluded. She was unemployed, and it was unclear how she would be able to provide for the four children. Although the mother had a strong bond with the children, she often missed visits—four in the month of June alone—and treatments.[1] Additionally, the mother had pending criminal charges.[2]

The mother had recently started making strides—admitting to using methamphetamine and beginning substance-abuse treatment—but she had not yet progressed substantively, and, while we certainly hope she does, we cannot say with confidence that she will. Thus, we cannot find that an additional six months to work toward reunification is warranted. *See* Iowa Code

---

[1] On the final day of the termination hearing, the mother's treatment counselor testified the mother's course of treatment was being extended by a number of weeks due to the amount of sessions the mother had missed.
[2] If it was known at the time of the hearings, it is not clear to us from the record what the likely disposition of the charges would be.

§ 232.104(2)(b) ("[A]n order [continuing the placement of the child for six months] shall enumerate the specific factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period."). Moreover, even if the mother followed through on everything she testified she planned to do—find a job, continue with her drug treatment, become more engaged in therapy, and discontinue associations with criminals and drug users—we cannot say the mother will not be incarcerated in six months.[3]

Next, the mother claims termination is not in the children's best interests. She notes that the children have been split up—two in one home, and two in another[4]—during the pendency of the case and are likely to be similarly situated in a permanent placement.[5] While we understand the concern about dividing the siblings, it is unclear what the mother would have us do. Whether the children are in one or two placements, they cannot return to the mother's care at this time, and they need permanency. *See In re J.E.*, 723 N.W.2d 793, 802 (Iowa 2006) (Cady, J., concurring specially) (noting the "defining elements in a child's best interests" are the child's safety and "need for a permanent home"); *see also In re*

---

[3] According to the State's brief to the juvenile court in lieu of a closing argument, the mother had the following pending charges: two counts of accessory after the fact, one count of possession of marijuana, one count of possession of drug paraphernalia, and one count of theft in the fifth degree.

[4] When the termination hearings began, two of the children were placed with the maternal grandmother and two were placed with a maternal uncle. Neither were permanent placement options.

[5] At the time of the termination hearing, DHS had a number of permanent placement options that were still being considered. Some involved the three youngest children in one home with the oldest in another; others involved two children being adopted by one family in an open adoption with the other two children in another home.

*C.B.*, 611 N.W.2d 489, 495 (Iowa 2000) ("Once the [statutory] limitation period lapses, termination proceedings must be viewed with a sense of urgency."). We cannot place the importance of the sibling bond over the individual safety and well-being of each of the children. *See In re I.H.*, No. 02-0758, 2002 WL 1433738, at *3 (Iowa Ct. App. July 3, 2002) ("We recognize, as [the father] argues, and the State does not deny, that there is a preference in the law for keeping siblings together, and the termination order severs the sibling relationship as well as the parental relationship. That preference is not strong enough to outweigh the evidence favoring termination in this case.").

The mother claims the closeness of the bond she shares with the children weighs against terminating her parental rights. *See* Iowa Code § 232.116(3)(c). While it is clear the children love the mother, we have found no evidence in the record that severing the relationship would be detrimental to the children. *See D.W.*, 791 N.W.2d at 709 ("Although it is clear [the mother] loves her [child], our consideration must center on whether the child will be disadvantaged by termination, and whether the disadvantage overcomes [the mother's] inability to provide for [the child's] developing needs.").

Finally, the mother urges that the children should have been placed in a guardianship with the paternal grandmother. *See* Iowa Code § 232.104(2). First, we note that guardianships are not legally preferred to the termination of the parent's rights. *See In re L.M.F.*, 490 N.W.2d 66, 67–68 (Iowa Ct. App. 1992) (stating that placement of children pursuant to permanency orders is not a legally preferential alternative to terminating parental rights when there is sufficient evidence to terminate). In fact, "[a]n appropriate determination to terminate a

parent-child relationship is not to be countermanded by the ability and willingness of a family relative to take the child." *In re C.K.*, 558 N.W.2d 170, 174 (Iowa 1997). Although the paternal grandmother had recently moved from California to Iowa for the express purpose of being available as a placement for the children, the grandmother did not yet have a residence in which she could accept the children. Additionally, we have concerns regarding whether the grandmother could or would keep the children safe from the parents in the future, if necessary. At the termination hearing, the grandmother seemed to question the need for DHS involvement with the family while minimizing the importance of the mother's drug use and the father's lack of involvement due to his incarceration. For example, the grandmother testified she thought the DHS worker at whom her son had shot was "vindictive" when the worker testified at the son's parole hearing. The following exchange occurred between the grandmother and one of the guardians ad litem:

> Q: [D]o you think [the DHS worker] is required to forgive your son for chasing her with a gun and shooting at her? A. He didn't chase after her. He didn't shoot her—at her.
> Q. What is your understanding that he [did]? A. That was—I don't know that that was really the allegation. It was an intimidation with a weapon was the final charge.
> Q. Do you know what intimidation with a weapon is? A. I don't—All I know is the circumstances of the case and he shot at her car tires.
> Q. And back to my question. Do you think she's required to forgive him? A. Well, I wouldn't say she's required to forgive him, but what I know about crime and, you know, being a victim, it's a two-way street. There's a lot of things being done now for—I don't know if I can remember the quite the right name—but where victims and the perpetrator or whatever you want to call it, they have kind of mediation type thing. I don't know what's that called, but I think it would be helpful if something like that might occur.

The juvenile court considered the option of the grandmother and the guardianship but ultimately decided against it. The court ruled:

> [T]he Court finds little in [the paternal grandmother's] testimony to cause the Court to do other than find for termination. The Court does note a significant portion of her testimony is directed at the perceived improprieties of [DHS] and her unhappiness with [it]. She is free to voice her displeasure in any legal means, but it is of dubious evidence in these cases. Her statement that she voiced displeasure regarding "a conspiracy against me" was not supported by the evidence. The Court does not find that establishment of guardianship in [the paternal grandmother] instead of termination would be appropriate or in the best interests of any child now before the Court.

We agree with the juvenile court that termination of the mother's parental rights was the best option for these children. We affirm the termination of the mother's rights to each of the four children.

**IV. Father's Appeal.**

The court also terminated the father's rights to W.A., C.A., and B.A. pursuant to section 232.116(1)(f) and to H.A. pursuant to subsection (h). The father does not challenge the court's findings under the first three elements, and he does not argue that the children could have been returned to him at the time of the termination hearings. Rather, the father maintains the children could have been returned to the mother, so the court should not have terminated his rights. "[The father] did not have standing to assert that argument on [the mother's] behalf in an effort to ultimately gain a benefit for himself, that is, the reversal of the termination of *his* parental rights." *In re K.R.*, 737 N.W.2d 321, 323 (Iowa Ct. App. 2007). Because the father has not made any arguments challenging the statutory grounds to terminate his rights under these subsections, any claim of error is waived. *See Hyler v. Garner*, 548 N.W.2d 864, 870 (Iowa 1996) ("[O]ur

review is confined to those propositions relied upon by the appellant for reversal on appeal.").

Next the father argues the court should have given him a six-month extension to work toward reunification. He argues the court's denial of his request violated his Due Process rights. In making his argument, the father lays out three factors that are to be considered when determining whether a party has received Due Process. *See Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976) ("More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."). The father then considers only one of the factors— claiming that his and his children's private interests in their relationship weighs against termination. *See F.K. v. Iowa Dist. Ct.*, 630 N.W.2d 801, 808 (Iowa 2001) ("The Supreme Court has also recognized that a parent's right to the care and custody of a child is reciprocated by the child's liberty interest in familial association . . . ."). The father has not challenged the process or scheme set out by the legislature involving CINA adjudications, permanency hearings, or the ultimate termination process, nor has he claimed that process was not followed here. The father also fails to consider the State's interest and its "heavy responsibility of 'assur[ing] that every child within its borders receives proper care

and treatment . . . .'" *Id.* at 809 (quoting *In re A.M.H.*, 516 N.W.2d 867, 871 (Iowa 1994) (alteration in original)). Having considered and weighed each of the three factors, we find the juvenile court's denial of the father's request for a six-month extension was not a violation of the father's right to Due Process.

Moreover, we agree with the court that the extension was not warranted here. Although the father was to be discharged from prison within six months, it was unclear where he would live once he was discharged. He appeared to expect to move back to the family home, but the mother talked of selling it. She also had at least one new paramour, so it is unclear if the father would be welcomed back into the family home. Additionally, the father had refused to sign releases for DHS while he was in prison, so we have no record of what services or classes he may have taken while incarcerated, and DHS had no way of knowing what medications, therapy, or treatment the father would need once he was released. The father cites his numerous visits and phone calls with the children during his incarceration as proof that he will be ready to parent full-time once he is released, but as the juvenile court stated, "While the phone calls are probably a positive aspect of his relationship with his children, parenting involves more than phone calls, and 'playing *Monopoly* and whatever games are available' is not much parental involvement over the last two years."

The father maintains termination of his parental rights is not in the children's best interests due to the closeness of their relationship. Although the two oldest children have been able to talk to their father relatively frequently while he has been in prison, he has largely been out of the children's day-to-day lives since he was incarcerated in 2014. Nothing in the record suggests that

termination would be so detrimental to these children to outweigh the benefits of permanency.

The father makes the same arguments as the mother regarding the fact that he believes dividing the children into separate permanent placements is not in the children's best interests and the paternal grandmother should be guardian of the children. For the same reasons the mother's arguments were unsuccessful, the father's also fail.

We affirm the termination of the father's parental rights to each of the four children.

**AFFIRMED ON BOTH APPEALS.**